Case No. 14-1281, Oklahoma Gas and Electric Company Petitioner v. Federal Energy Regulatory Commission. Mr. Driver for the petitioner, Mr. Fulton for the respondent. Good morning. Good morning. May it please the Court, the question presented in this appeal is whether the government can disregard the fact that a valid contract is a contract when it decides whether or not it can modify that contract under Section 206 of the Federal Power Act. The basis of the tension here is the Mobile Sierra Doctrine, which is based on the role of private contracting in the energy industry, which was developed in contrast to the way in which these matters were handled under the Interstate Commerce Act. So there's a special role for private contracting within the Federal Power Act and Natural Gas Act scheme established by Congress. I thought there was a special role for private contracting of rates under. That's what Sierra involved. That's what every Supreme Court decision is involved in. That's every decision I've been able to find in this circuit has involved rate setting. Your Honor, the reason that most of the cases that arise in this context relate to rates is that is the primary area of the government's authority here. And so if the government's area of primary authority must give way to private contracting, so too should the government's authority give way in areas that are removed from rates or secondary to rates. Well, when you say primarily, I couldn't. You're much more expert in this area than I am. I could not find a case from the Supreme Court or this Court that did not involve Applied Mobile Sierra outside the context of rates, methodology for calculating rates, or the process and procedures for determining rates. But if I'm missing something, please point me to it. Well, Your Honor, one case that comes to mind is a 2007 Wisconsin public power case in which the issue there was scheduling issues. Scheduling what? Your Honor, my knowledge of that case is simplified enough. I'm sure that it relates to rates to some degree. Ultimately, there's almost no case that would come in which FERC would have jurisdiction in which either it didn't directly set or affect rates. This is an unusual situation. Your Honor, the contract is among horizontal competitors and seems like something that's, by granting a right of first refusal, restricting entry by future competitors, which seems unusual in terms of granting this protection that you're asking for to this kind of contract. Your Honor, in fact, that same Wisconsin case that I just mentioned a moment ago from 2007, which I can refer to more specifically perhaps in that rebuttal, also addressed elements of the Midwest ISO Transmission Owners Agreement and ultimately indicated that the respect for contracts that is sort of at the heart of the Mobile Sierra Doctrine also applied to that agreement related to how things should be handled generally in the Midwest ISO, including between horizontal entities. But, well, what about Judge Posner's opinion? What's wrong with his opinion? Well, Your Honor, with respect to Judge Posner's decision in the Midwest transmission owners case, one point of difference, I hope, is that that case did not actually discuss at any length the Morgan Stanley decision. It ultimately, I believe, shorthanded the Mobile Sierra Doctrine by relying specifically on the Sierra case, but there's important elements of the doctrine that were discussed and described in Morgan Stanley. It's really the modern understanding of the doctrine that is really what FERC is reacting to at this stage in issuing a rule in 2011. It was really dealing with the Morgan Stanley case and the energy power marketing case, and those cases have an understanding of the doctrine that is not matched by sort of the relatively simple discussion, I think, of Sierra and the seven circuits decision. Well, the theory here is, or the theory of the doctrine, correct me if I'm wrong, is that if you agree by contract to a rate, FERC can't come in and upset the contract because that would be, because both sides bargain at arm's length, customer, supplier, what have you, and FERC can't come in. But when you have, go ahead and correct me. Well, Your Honor, but it's just a presumption, meaning that what happens is that if it's a contract. I was shorthanding it, but you're right, and there's the public interest override. But in protecting settlement expectations, it just seems that that goal is not an issue in a situation like this. We're talking about, and again, correct me if I'm wrong, but for the most part, horizontal players in the same market agreeing about, well, if someone else wants to enter and do what we're doing, we're going to grant ourselves the right of first refusal. Well, first of all, on the facts here with respect to the SPP membership agreement, it was a negotiation between not just transmission owners but also transmission customers who were going to pay the rates at the end of this process. It was a membership agreement, not an ownership agreement, meaning it defined the obligations of not only the transmission-owning members of the Southwest Power Pool, but also of non-transmission-owning members. And in addition to that, those negotiations included the Southwest Power Pool itself, which is the entity to whom the membership agreement was going to be transferring control over the businesses of the transmission owners. And I just sort of want to go back to where this originated, which is that this was a world in which each of the transmission owners was a monopolist at that point in terms of providing service in its own local area. And what that agreement did was establish a contractual basis for regionalizing that service and handing control of their facilities to an independent entity that would arrange for transmission service, handle planning, and instruct the owners to construct facilities. And so although there were horizontal business interests as part of that, there were also vertical business interests. And I would argue both vertically in terms of the customers, but also at some level vertically in terms of the SPP. Would you agree at least that the Mobile Sierra decision from the Supreme Court and the decisions that's issued since then, Morgan Stanley, do not by their terms answer this question as to whether this presumption should apply to this type of contract? I don't think that there's a single sentence out of one of those orders where we all knew the result here. I don't know that we'd be here if it did. And so there is phrasing that's picked up by the government in their orders, but there's certainly no intent in the Morgan Stanley order to develop a whole new test that is a predicate. Let me put aside the test. Yes, you have. The statute talks about rates setting and different ways of setting rates, either through tariff or contract. And on the assumption, I think Mobile Sierra was talking about, on the assumption that when parties are negotiating rates themselves, they'll be very self-interested on both sides in doing that, but that this is, as Judge Kavanaugh has said, an entirely different type of contractual arrangement. And you have good arguments for why there should be a similar assumption there, and they have their arguments for why there shouldn't be. But my understanding of your position was that Mobile Sierra controlled. Your Honor, the way I would interpret Morgan Stanley is that any contract that's a valid contract, one that's not the result of fraud, duress, or unlawful market activity, would be a contract where you would start the analysis with the presumption in place. How does Morgan Stanley support that extension to all contracts in the energy sector as opposed to rates? Is there stuff in Morgan Stanley that says this shouldn't be limited to rates, this is a general principle of contracts in the energy area? There is language in Morgan Stanley that talks about the policy role, the significance of the preservation of contract stability, which is not stated in a way that says there's an important goal in the stability of bilateral contracts or any particular form of contract. It's the fact that the regulatory regime is layered over top of what already exists, which is the ability of companies to enter into contracts. And so there's policies that relate to the significance of contract stability, which come out of cases like Verizon and Permian Basin, and Mobile itself are talking about the role of contracts independent of the regulatory overlay. How does the public interest analysis work? So I think part of your argument is they effectively did the public interest analysis here, and how should it work if we were in that box? And I don't need you to go into great detail, but what do you think the basics of the public interest analysis would be? In my mind, the distinction that's always made is a showing about how the contract affects third parties as opposed to necessarily the parties to the contract. So if you identify that in the standards, it tears the arms. The argument would be that people who want to come in and compete or build, as I understand it, can't do so if the right of first refusal is exercised. Well, one point I want to make is that, of course, the first analysis is of that single sentence or single provision of this contract. And so one of the errors in the first order that I've tried to highlight for the court is that they've taken an integrated agreement that does multiple things, and I would argue pro-competitively, and snatches out one provision of that contract and says this provision has some inherent quality that we don't like about it, and so this provision doesn't need the Mobile Sierra doctrine. In fact, your whole agreement doesn't get the Mobile Sierra doctrine because that one sentence is in your contract. And so one question. So in the public interest, you'd say even if one provision in isolation looks arguably any competitive, look at the whole thing because the whole thing together is pro-competitive. I would, Your Honor. But then ultimately, regardless of whether that's an entire contract straddle or not. Is that analysis consistent with Morgan Stanley? Didn't the Supreme Court just hone in on one particular provision of a contract in Morgan Stanley, and, in fact, didn't they refer that to the Mobile Sierra provision or something of that nature is Justice Ginsburg's opinion? I think that there likely are cases that look at just the rate as sort of the last defining characteristic in a bilateral agreement, as you've got all these terms, but the fight ultimately settles in on the rate. And I think partly it depends on what FERC itself was modifying and then how many challenges to what the FERC did were raised. Here, of course, they're not taking any actions related to rates. In fact, this contract doesn't set rates. It's a membership agreement that allows the transmission owners and the other members of SPP to coordinate, and it ultimately has some effect on rates. And so here you have an agreement that doesn't even have a rate term in which the government has decided that one particular part of that agreement needs to be revised. Okay. Thank you. We'll give you the time for rebuttal. Thank you. Mr. Fulton. Ross Fulton here on behalf of the Commission. Your Honors, it may please the Court, the Commission here reasonably found that the Mobile Sierra presumption does not apply to the membership agreement because the agreement lacks the characteristics necessary to justify the presumption of just and reasonable rates. To reach that decision, the Commission had to decide two things. One is a matter of law. What type of agreements are subject to the Mobile Sierra presumption? And two, is the membership agreement that type of agreement? To take the first issue, all agreements affecting rates must be just and reasonable. And as the Supreme Court held in Morgan Stanley, and this Court has found as well, Mobile Sierra is just an example or a subset of just and reasonable rates. It's a method by which the Commission can presume that a contract is just and reasonable. So to have that presumption, however, the Supreme Court has found that certain premises must be in place to provide the assurances necessary for that presumption to exist. Why wasn't your obvious basis for saying that Mobile Sierra doesn't control, that this doesn't involve rates, methodology for rates, or the procedures for setting rates? That seems much easier than the complicated approach you've taken here and kind of find yourselves bumping into yourself on whether it's a whole contract or a single provision or those things. You are correct, Judge Millett, that all of the case law regarding Mobile Sierra has involved contract rates. And it's for this reason, I think, that this Court and Maine Public Utilities expressed doubt that Mobile Sierra should apply to a regional transmission organization agreement that affects all market participants. As Judge Kavanaugh pointed out, this is not adverse parties reaching a contract for rates. This is horizontal competitors that are contracting together to prevent future participants from entering the marketplace. And I believe that's why Judge Posner in his recent decision went back to Sierra because, again, the Court was looking at what was the premise, why does this doctrine exist in the first place? And the Sierra decision, again, was based on having a bilateral power sale contract between two adverse parties, not what Judge Posner referred to as a cartel to effectively prevent other competitors from entering the market. To Judge Millett's question, I agree with her question, first of all. That was my thought as well. But the second argument you have, the arm's length argument, does seem to have some overlap with the whole rates point that Judge Millett's question raised. So if you had said rates and arm's length, what is not completely overlapping between those two theories? Do you understand the question? I do, Your Honor. And you're correct. The Commission did not just decide on rates even though that has been where Mobile Sierra has been applied. And I think that there is significant overlap. I think that rates are sort of, again, the paradigm example of where Mobile Sierra has been applied. And the reason it's been applied in that rate context is because you have these arm's length negotiations. As the Commission discusses in its re-hearing over page 98, the reason that we can presume these sort of paradigm Mobile Sierra contracts to be just and reasonable is because negotiations between adverse parties are economically efficient. They're going to result in lower costs because you have parties trying to reach what's in their best interest. But here, as the court has already found in South Carolina, by definition, rates of first refusal are reached in a common interest, which prevent competition and thus raise costs. So is the Commission preserving the possibility that the presumption could apply to contracts dealing with things other than rates? Not to speak for the Commission, Your Honor, but I believe the Commission is. And part of the reason is the Commission, in certain instances, has found that although Mobile Sierra is not required as a matter of law, the Commission has the discretion to apply Mobile Sierra. In fact, it just did so in the Ninth Circuit California case that we pointed out in supplemental authority. And, in fact, there's a subsequent case that's pending before this court involving the New England Regional Transmission Organization where the Commission said we don't have to apply Mobile Sierra, we will out of our discretion, but the public interest argues against Mobile Sierra. So when I first read everything, I thought that what FERC was really doing was the public interest analysis, but you didn't go through the hoops. Now, I understand your arm's-length argument, so don't assume I'm reaching a conclusion one way or another, but doesn't it seem like what's happened here is there's been a contract negotiated among parties and FERC's saying that contract is against the public interest because, for the reason you said and I asked earlier, it's a horizontal agreement to restrict competition and, therefore, it's against the public interest. And why didn't it go through that hoop or why isn't that a better way to go or why shouldn't, to ask a third question, why shouldn't we remand for FERC to go, the Commission to go through that analysis? Sure. Well, let me see if I can take those one at a time. I do think that there is obviously some overlap between whether the Mobile Sierra presumption applies in the first place and what is the public interest because, again, to go back to sort of the base, it's all about what constitutes just and reasonable rates. And so just and reasonable rates are in and of themselves in the public interest. And so with Mobile Sierra contracts, again, the Commission can presume that they are just and reasonable because there are indicia that exist that show that that contract is in the public interest, and one of those is arm's-length negotiations. With regards to why didn't the Commission go through a public interest finding here, again, the Commission found that it wasn't necessary to do so because Mobile Sierra did not apply. Again, the Court will be faced with that issue in a subsequent decision that's pending before this Court right now where the Commission found that it was not. Because I don't understand what you need to preserve. It's been recognized that you can, as a matter of your own policy, determine if you do it through appropriate reason, decision-making, that even when we're outside the realm of Supreme Court controlling precedent on Mobile Sierra, we think it makes good sense under the statute to apply it to different contexts. You don't need to preserve anything about what the Supreme Court was talking about in Mobile Sierra as long as it's agreed we're not in that environment, we're not in the rate-setting environment, and we'll make a public interest determination on whether we choose or not choose to apply that policy, a similar policy, as a matter of discretion as the cases arise. If I understand you correctly, Your Honor, I agree that the Commission does have discretion to determine when Mobile Sierra applies within the precedent set by the Supreme Court. I'm sorry, maybe I wasn't clear. It's not a question of saying Mobile Sierra applies. It's that the Commission comes up with its own Mobile Sierra Prime theory of contracts for other contexts, and it's not, it just seemed like both sides had this very tortured, lengthy briefing on whether the Supreme Court meant this to apply here or not, when it seems the easier answer is the Supreme Court didn't decide that, and it's up to the Commission, if it makes the appropriate reason, decision-making, to say whether it wants similar principles to apply to other types of contracts. I agree, Your Honor. That's a good theory for you. I agree. Just say yes. Yes. Yes, you are correct, Your Honor. The Commission, basically working within what precedent exists out there, tried to engage in reasoned decision-making to determine these are the type of contracts to which Mobile Sierra presumption should apply. Now, the other side would say, but the logic of Mobile Sierra applies to all contracts in this field, and therefore you have to go through the public interest, too. So I guess that's the question we ultimately have to decide, whether the logic does go beyond the rate setting or the rate contracts. That's correct, Your Honor. I think that this Court obviously has to decide what the Supreme Court meant in Morgan Stanley. I think that the reach of petitioners' position would essentially, effectively any contract is a Mobile Sierra contract as long as it has a signature page, because what the Morgan Stanley Court said... And the harm and the problems from that are? The harm and the problems from that are, well, it's inconsistent with a presumption that all contracts result in just and reasonable rates. It's inconsistent? It's inconsistent because there's no, as Morgan Stanley pointed out, there's certain instances where a contract should not be presumed to be just and reasonable, where the premises of arm's-length individual negotiations don't exist. You have the public interest backstopped. So their theory, as I understand it, is contracts are different, and the Commission should respect contracts unless it concludes that the contract's not in the public interest. Nice, simple, clear rule. What's wrong with that? The problem is that the public interest standard flips the burden, puts the burden on the Commission to demonstrate that... You don't doubt you could meet it here, do you? I do not doubt that the Commission can meet it. In fact, the Commission has found in the Merrill case that's pending before this court that this type of agreement is not in the public interest for right of first refusal. That being said, there's obviously cases down the road that may be closer calls. It's obviously hard to predict, but by flipping the burden, it's allowing... Is that all that's really at stake here is flipping the burden? Maybe it is, and that's not a minor deal. I get that, but if we do it your way, you'll have the burden to show just and reasonable. If we do it the other way, you'd have the burden to show not in the public interest. I'd say at an even bigger level, it's about how much authority does the Commission have to determine what are just and reasonable rates, as opposed to how much must be presumed to be just and reasonable and have to defer to private contracts. Obviously, private contracts can go to the point of precluding competitors from competing. Again, how much discretion and authority does the agency have to be able to determine what's just and reasonable and in the public's interest in the first instance? One way to interpret what you're saying is don't extend the presumption, the Mobile Sierra presumption, to beyond the rates because those may not be in the public interest. That's correct, Your Honor. And don't put the burden on us to show that, but put the burden on them to demonstrate that those contracts outside the rates context are just and reasonable. That's correct, Your Honor. Yes. And I would also point out, I know that we've discussed arm's length negotiations aspect of this, but the Commission also had a separate basis for finding that Mobile Sierra should not apply, which is that this was a generally applicable contract. The vast majority of the members, after this agreement was filed, had to accept the entire agreement as is. If you go to the Southwest Powerful website, there is a signature page that any party can sign. To alter the agreement, it requires the agreement of all 90 members. I think it's pretty self-evident that the incumbent transmission owners are not going to agree to alter their rights of first refusal. It would certainly not be in their interest to do so. And so the Commission had both the fact that rights of first refusal are not results in arm's length negotiations, as well as the fact that this was a generally applicable form of contract. Can you answer one question for me? My understanding is that some years past, the Commission really supported and wanted transmission companies to enter into these groups, these organizations, these system operations like this. So to come together, these horizontal competitors, to come together and consolidate their operations. And in doing so, they came forward with these agreements, and those agreements were all filed with the Commission, correct? That's correct, Your Honor. Yes. Did the Commission bless them at that time in the public interest? The Commission, in certain instances, has found, for instance here, it did find the membership agreement just and reasonable when it was filed. And so now, is the problem that they just didn't look that closely? Or, I mean, so now we're told that at least this one part of this, a lot of these contracts have these provisions, and those things are not just and reasonable and against the public interest. I'm just trying to figure out what to do with that prior determination. Sure. I think there's two issues. As a matter of law, Morgan Stanley has said, just because a Commission at one point finds a contract just and reasonable does not mean that it's already made a Mogul Sierra determination. I think as a practical matter, the reality is, and Judge Posner discussed this in his decision, that the fact is that the electricity market has changed, and Order 1000 was a big part of that change, and the Commission has found this agreement was entered in 1999. In the last five to ten years, the Commission has found that competition is now possible in these income and transmission territories. So where once a right of first refusal was perhaps harmless because it wouldn't have altered anything on the ground, the reality is now that this competition is possible. And as Judge Posner puts it, a non-incumbent can come in with a great plan to increase competition, which would lower costs for consumers, and the incumbent can say, thank you very much, we'll take that plan and we'll build it, and then competition does not exist. I get that, but then you have these folks who entered into contractual agreements with, you know, trading one thing, a lot of horse trading, and we get this and we'll agree to do that as long as we get this, and then a decade or two after the fact, after FERC already said good to go from our end, FERC comes in and says, actually, we're just going to take one of those things out of your contract bargain. What are they supposed to do about the loss of that aspect of their contract bargain? Well, I think, to take a step back, Your Honor, in South Carolina this court upheld the commission having substantial evidence that rights of first refusal should be removed because there's a common interest in preventing competition, which in turn creates market inefficiency and increased rates. At that time the commission said, come back to us on compliance filing and offer any evidence that you would like that these are somehow, nonetheless, the Mobile Sierra applies. And to prove that Mobile Sierra applies, they have to show, again, that these were at arm's length negotiations. And the petitioners and interveners here at Ample Opportunity showed, no, we had arm's length negotiations. In other words, this agreement was actually reached with non-incumbent transmission providers that wanted to increase competition in these regions. No, I understand that. Even if Mobile Sierra doesn't apply, are there other provisions that protect? Are there other principles that protect the bargain that these folks took? Or is that just the nature of bargaining in a highly regulated area, that things can change? No, absolutely, Your Honor. It's still a valid contract. It's still subject to a just and reasonable determination. So this is not abrogating a contract or changing the membership agreement. It's simply that this provision is not just and reasonable, and so it needs to be removed. But it was multiple parties bargaining at the time, and this was not the only provision. That's the point that your opposing counsel makes. And this was all, as these multiple-party negotiations would be, a number of different issues that people are giving and taking. And part of that was this provision, which protects their contract rights. Well, as Judge Wilkins pointed out earlier, Your Honor, the NRG, for instance, looked at just one provision in terms of whether Mobile Sierra should apply. So it's not – No, but just on my broader point, isn't there in kind of a public fairness, public interest kind of analysis, this wasn't the only provision that was negotiated. There were lots of provisions. And so to the point, yeah, this is one anti-competitive provision from your perspective, but it's within an overall agreement that, to Judge Millett's point, served a broader purpose and was pro-competitive. And why should we pull that one thread out, therefore? And I – again, the – At least without you showing the public interest, the burden being unused to the public interest. Again, at the administrative level, Your Honor, the petitioners and interveners had ample opportunity to – they could have pointed out, look, we gave up X, Y, and Z to preserve our right of first refusal. That type of evidence is not in the record. And I think there's, again, sort of two layers – Is it just obvious, though? I mean, that's obvious from the nature of a large agreement involving all sorts of parties with different interests. I suppose it depends on, again, whether there were any parties to the membership agreement that had the contrary interest of wanting to increase competition in these areas were the incumbents. If there wasn't, they may have orchestrated on separate issues, but they would have been fine saying, no, here you go, have at it. And as the commission found, for instance, SPP isn't an adverse party itself. So it, by definition, can't bargain. And I think it's sort of the bigger point, again, there's sort of the two issues of, as a matter of law, is – How come they say customers were also a party to this agreement? The initial task force members list, the petitioners and interveners did not ever introduce in the record who was actually a member of this task force that negotiated it. Now, as it stands today, there are 90 members, and there presumably are customers involved in that. However, that runs into, then, the problem of once this agreement was filed with the commission, to join the Southwest Power Pool, you just have to accept the agreement. It's, as a practical matter, impossible for them to negotiate. But at the time it was negotiated, were customers there too? Again, there's not evidence in the record of who precisely were these task members. Other than the parties to the agreement weren't listed when it was first filed? The commission did not make any finding about that, Your Honor. Petitioners, in their request for a hearing, stated that there were non-transmission owners. Again, the commissioners working from the baseline in Order 1000 that these were not just and reasonable, but feel free to present evidence to us on compliance that, nonetheless, Mobile CR should apply. So, as a practical matter, I would expect parties that were very interested in their right of first refusal to say, no, look, here, we had arm's-length negotiations over this provision. And also, I should say, in South Carolina, where this evidence is difficult, and it's obviously empirically difficult to go back in time and see precisely what those parties were thinking, this court held that the commission can rely on principles of economic theory, basically competition theory. And that's why the court in South Carolina upheld the finding that the right of first refusal was a common, inclusive agreement to prevent competition. And that same basic principles apply here for why the right of first refusal. I guess it just seems odd to say you're going to argue you're going to apply these economic principles on the assumption that there was actually no arm's-length negotiating when, in fact, if there were customers there, wouldn't that change your whole image of whether there was arm's-length negotiations? I suppose it would depend on who the customers were. Again, this would be a second-order issue of once we agree as a matter of law that arm's-length negotiations need to exist for the Mobile CR presumption to apply, then, as applied specifically to this membership agreement, were there arm's-length negotiations. It sounds like another reason to say Mobile CR is confined to rates and that you don't have to do this. Yes, Your Honor. As I said, the paradigm example is buying a rate. I didn't think there were any purchasers in the original agreement. Again, there's no evidence that there were purchasers. You're correct, Your Honor. Well, that's not exactly what I said, but yeah. I'm sorry if I repeated you incorrectly. I apologize. That's fine. Yes, and again, I think that if there are consumers or purchasers after the initial agreement was reached, then it's a separate issue. Thank you very much for your time. Two minutes for rebuttal. I don't want to read them out, but at the joint appendix at page 809, footnote 5 on that page, is the list of the people on that task force, which include, it's hard to tell when you don't know who they are, but there are entities on this that are known as transmission-dependent utilities. What entity? I'm sorry, it's 809 of the joint appendix. Was the task force the same as members, parties to the agreement? Your Honor, these are the parties that negotiated the terms of the agreement. I believe that each member then signed a separate page. The version that is attached in the joint appendix, I think, probably has primarily transmission-owner signature pages, but these are the people that negotiated the agreement. In addition to that, it was ultimately approved by the SPP Board, which itself is divided between transmission-owner interests, customer interests, and an additional group in there. But this is the evidence in the record as to who negotiated the agreement as part of this task force. The record is not silent on that point. Another point that the record is not silent on is that the Southwest Power Pool itself, in its initial compliance filing, submitted information saying that the membership agreement is in the public interest and benefits the public interest. And at paragraph 108 of the rehearing order, which is joint appendix page 723, the government decided that because we found that the presumption does not apply, it is not necessary to consider SPP's arguments and evidence regarding benefits to the public interest. And so the only evidence in the record on public interest is submitted in support of the agreement, and because they didn't have to apply the presumption, they didn't consider it. And so it's not, in fact, the case that they did a light-handed version of a public interest test at the front end. Instead, they looked at different factors in order to make their determination. Explain that to me because I'm stuck on that. They conclude that the burden's on you, in essence, to show that this right of first refusal provision is just and reasonable, and you say the burden should be on them to show that the right of first refusal provision is unjust and unreasonable or not in the public interest. In every instance, the burden was on the government here because it was under Section 206 of the Federal Power Act. The question was whether you apply the ordinary just and reasonable standard or the public interest version of the just and reasonable standard. Okay, well, let me pause on that. At every instance, the burden's on them, and distinguish those two things again. The question is whether A or B. What are the A and B? I think that the A and B are the standard. Morgan Stanley warned us not to call this a standard of review, but it's the standard you apply to assess the evidence, right? It's the ordinary standard or the public interest standard, which focuses on the harm to third parties. So they have the burden of showing it's unjust and unreasonable, or they have the burden of showing that it's not in the public interest. That's what the case comes down to, in your view. And then what's the difference between those two things? Well, that's the outcome, right, of this case. This case isn't about that. It's really about whether they could just decide which of those standards of review applies. No, I know, but under your theory, the presumption applies, so they have to show that it's not in the public interest. Under their theory, as modified by you, they have to show that it's unjust and unreasonable. That's right. Ultimately, I'm trying to figure out what's the delta between unjust and unreasonable and not in the public interest. To me, it always hangs on the type of evidence that you would use, and the focus would primarily be on harms to third parties and maybe the level of that harm, because the Supreme Court has said that once the presumption applies, it's only when the contract seriously harms the public interest that it ought to be abrogated or modified. And I just want to get really quickly to the point. I'll give you time. I just wanted to make sure I understood that. Okay. Go ahead. If the way this all turns is that suddenly we're talking about just whole classes of contracts that have nothing to do with Mobile Sierra, what you'll have is a policy like this one, a new policy that comes up. The government will simply decide that there's a basis for the policy, and then they'll apply that policy, and the fact that you have contracts in place that say whatever they say now becomes effectively irrelevant, right, in the government's, in the agency's mind. And the fact that you had this elaborate negotiation, perhaps a negotiation that made all of this possible, because there wouldn't be a Southwest Power Pool without this agreement. There wouldn't be a regional transmission service. There wouldn't be a question of other people wanting to join this group, right? Because people can build lines without this group. If I can interpret what you're saying there, you're saying if we lose, if you lose, you don't want to lose on the ground that the presumption only applies to rates. If you lose, you'd rather lose, and again, you don't want to lose, but if you were going to lose, you'd rather lose on the ground that at least this particular type of contract is outside the presumption. And in particular, that wasn't the reason. Is that a correct interpretation of what you're saying? I know you don't want to lose, so I'm just saying. The broader you're holding on the number of contracts you then throw out of Mobile Sierra, right, the more harm done. Okay, and specify the harm again so I understand that. Is that you would disregard the underlying contractual negotiations and the contract interest that were at the heart of that. And it just strikes me as so odd that what we're talking about is giving FERC more power the further it gets away from rates. Their maximum level of jurisdiction and authority here has got to be on rates. And as you move away from that, are you saying that they can, every contract that gets further away from the heart of what the FERC does is easier to modify because the reason there's a doctrine on rates is that's where they have the most power. And when they focus on the rates historically, that's where you've gotten a doctrine that limits some of their powers. But don't adopt a doctrine that gives them more and more power the further they get from the heart of their jurisdiction. But isn't part of the issue here that it's all going to come back to rates because of the cost recovery for whatever the work is that's done? That's the only basis for jurisdiction over the membership agreement at all. And is it on the theory that it affects rates? And so it does affect rates. So if we want to say that the doctrine applies to contracts that affect rates, then I'm on board. But if we say that it's only rate-setting contracts and things that affect rates might have, for example, this contract talks about reliability of the grid. It talks about when people have to take their units out or redispatch their units, they have obligations to the region to do that. There's all sorts of topics in here that have some effect. But all of those things are now much easier to modify in light of the orders that we have below. And I would just like to say that the way this test gets applied on the facts demonstrates some of the weaknesses of the test. It ignores the fact that the customers were in the negotiations. It ignores the fact that people amended the agreements later. It's not really a tariff. It is an agreement. It's hard for a newcomer to get any change, correct? It is, but it's a joint venture that's covering a giant region in which everyone is agreed to transfer control over their assets. I mean, the transmission unit here gave up contractual privity with their own customers and now rely on the region to give them their revenues. They used to collect their revenues directly. Now they hand it to a different entity. They'd like to control that and not have those sorts of powers taken away, modified so that suddenly their business is completely different. So if we agreed with you, we'd, of course, be creating a circuit split with the Seventh Circuit, and we're not afraid of doing that. But you would say that Judge Posner and Easterbrook and Hamilton missed the boat. They didn't understand. What didn't they understand? Well, one thing they did is they focused. It seemed as if the presumption was that this was an agreement about a right of first refusal. So they didn't understand the broader context. Yes, that this is a broader contract than that. One distinguishing fact, although I really don't want to put only a fact, I want to weigh bigger than that, is that there were other interests involved in this negotiation. And then the question that Judge Posner asked was, well, no one showed me that this was in the public interest. Well, first of all, in our record, the only evidence that this was in the public interest was submitted that the agreement was in the public interest, and the folks said that didn't matter to them. But I think that's a wrong question, right? It's not really the same. It's not can I demonstrate a benefit to the public interest. It's whether the government can demonstrate a harm to the public interest. So you think he flipped the burden on the public interest. And he said you didn't show that, or not you, but didn't show that MISO was likely to fall apart as a consequence of the repeal of the right. Is that true, though? You're not suggesting it's going to fall apart? I know you think that's a wrong question. I don't know whether this would fall apart. You don't want to say yes to that. There's a lot of benefits to that contract, and so I think people would probably stay in it. But, of course, the standard of review can't depend on it. Well, if I make seven changes and you live with the contract, oh, I'm going to make eight changes, and now you want to bust up the region, well, that's a different legal standard. Well, what about, again, your briefing came across as very much the Supreme Court requires mandates. The Mobile Sierra applies here, and their efforts to wiggle out of it fail. And that was your whole reason why we don't give them any deference, is because this is an interpretation of Supreme Court precedent. And if we thought just hypothetically that the Supreme Court precedent didn't answer this question, that it doesn't mandate an answer, but it's also been recognized that the commission has the discretion to apply Mobile Sierra principles more broadly. How would the burden of proof work there? And is there a pattern that you can point to where the commission has already been doing that, that this was a departure from? Well, the way I have always thought of this case is trying to decide whether you're going to make certain decisions based on contractual rights versus the government's authority. And the more authority we give FERC here to say, well, none of these precedents apply, the more it's all going to be in their discretion again. It'll apply sometimes, it'll apply other times. But that's incredibly disruptive of the idea of contractual stability. If you're a member of the SBP and you make this negotiation and then you pluck a provision out under this lower and discretionary standard of review, it really does interfere with the idea that you're making contractual commitments that you thought would be respected. So I don't know if that was directly responsive to your question. Okay. Thank you very much. Thank you. The case is submitted.
judges: Kavanaugh, Millett, Wilkins